For the reasons stated, the trial court's judgment is

Affirmed.

**The STATE of Texas, Appellant,**

v.

**John F. RUBION, Independent Executor and Trustee of the Estate of Nellie Hansley, Deceased, et al., Appellees.**

No. 12991.

Court of Civil Appeals of Texas. Galveston.

June 14, 1956.

Rehearing Denied July 12, 1956.

John Ben Shepperd, Atty. Gen. of Texas, Katherine W. Conti, Asst. Atty. Gen., Russell G. Poling, E. M. Scott and W. O. Smyth, Board for Texas State Hospitals and Special Schools, Austin, and A. R. Schwartz, Former County Atty., Galveston County, Galveston, for appellant.

Lawrence M. Coughlin, Galveston, for appellees.

GANNON, Justice.

This is a suit by the State of Texas, through the Board of Texas State Hospitals and Special Schools, against John F. Rubion in his capacity as independent executor and trustee of the estate of Nellie Hansley, deceased—denominated as principal defendant—and Ella Sidney Hansley, Non Compos Mentis, described as beneficiary of the trust estate, seeking to recover the balance alleged to be due the State to reimburse it for its expense in furnishing support, maintenance and treatment to Ella Sidney Hansley at the Abilene State Hospital for the period April 25, 1945, to June 30, 1953. Such balance was alleged to be $3,068.40, of which it was alleged $2,980 accrued after January 23, 1947, the date of the death of the testatrix. The remainder of said unpaid balance, it was alleged, accrued prior to the date of the death of the testatrix.

The petition treats the trust estate—erroneously, we think—as coming into being on the date of the testatrix's death, but, in the view we take of the case, this becomes immaterial. Of said total balance the State sought recovery from John F. Rubion as trustee of $2,980. It sought judgment against Ella Sidney Hansley for $88.40, the remainder of said unpaid balance accruing prior to the date of the testatrix's death. In support of its prayer for relief against Ella Sidney Hansley, the incompetent, it was alleged that the incompetent "owns a small portion of property in her own right."

On a trial before the court without a jury, judgment was rendered against the State and in favor of both defendants.

On appeal, the State brings forward no point complaining of the judgment in favor of the incompetent and the sole question before us is the right of the State, as a matter of law, to be reimbursed out of assets in the hands of the trustee.

It is undisputed that by her will, Nellie Hansley devised all of her residuary estate remaining after payment of debts to John

F. Rubion, in trust, during the lifetime of Ella Hansley, with the following powers and for the following purposes and uses, as set out in the will:

"(a) From such estate, and from the proceeds of any insurance policy on my life, payable either to the said John F. Roubion, Trustee, or otherwise, or which may be payable to my estate, my said trustee shall, at his descretion, and by the exercise of his own judgment, *provide a means* for the support and maintenance of my grand-daughter and adopted daughter, Ella Hansley, who, at this time is unable to provide for herself.

"(b) My said trustee, shall have the power and authority and the same is hereby conferred upon him, to sell and dispose of any part of my estate either for cash or otherwise and to execute and deliver all necessary instruments and documents to evidence such sale or other disposition; and he is further authorized to receive, endorse and negotiate all bills of exchange, notes and checks in connection with such sale or transfer or in any wise connected with the transaction of business having to do with such estate.

"(c) My said trustee shall have the power and authority and the same is hereby conferred upon him to invest and reinvest all monies belonging to such estate, and to sell and convey any and all investments so made and to re-invest the proceeds at his discretion.

"(d) It is the intention hereof to give and grant to my said trustee full and complete powers of ownership over said estate in order that he may, to the best of his ability, carry out the purposes of this trust, that is, *to provide a means of support for my grand-daughter and adopted daughter, Ella Hansley,* in so far as *such estate will permit, and to provide for her both in sickness* and health, using therefor either the income or corpus of such estate, or both *as the exigencies of the situation may require."* (Emphasis supplied.)

The foregoing quoted provisions of the will of Nellie Hansley, Deceased, constitute all of the writing in the will relating to the trust, the powers of the trustee, and the purposes and uses of the trust. By an additional provision, all property remaining in the hands of the trustee on termination of the trust at the death of Ella Sidney Hansley is devised and bequeathed to John F. Rubion, in his own right.

The will was executed July 7, 1945, which was some three months after Ella Sidney Hansley, who had never been married, and at the time was thirty-one years of age, was adjudged an epileptic by the County Court of Galveston County and ordered admitted to the Abilene State Hospital at Abilene, Texas.

Ella Sidney Hansley continuously remained a patient at the Abilene State Hospital from the date of her admission, April 25, 1945, down to the date of the trial and presumably still so remains. It is apparently uncontradicted that though there is no cure for epilepsy, the condition of some epileptics improves to an extent that their residence in an epileptic hospital is no longer necessary. The trial court found that "The testimony of plaintiff's witness, Philip E. Hetzel, that there is no cure for epilepsy but that some patients have been released from the Abilene State Hospital," is uncontradicted.

The incompetent epileptic is the grand-daughter and adopted daughter of Nellie Hansley, the trustor. Rubion, the trustee, is the trustor's nephew.

Rubion testified that in administering the trust, the assets and revenues of which he was preserving intact, he had only one thing in mind "and that is if Ella Hansley ever gets out, the $40.00 a month I am getting for the house now and what she [the trust] has in the bank now will enable

me to put her in some convalescent home and keep her."

It is undisputed that in addition to cash of some $1,800, the sole remaining trust asset is a piece of residential rent property located in Galveston of the approximate value of $4,000. This is presently rented at $40 a month. It appears that at the death of the testatrix the real property was in a bad state of repair and that substantially the whole of the rents derived from it down to the date of trial had been expended in its maintenance, rehabilitation and repair.

In its examination of Rubion, called by the State as an adverse witness, the State recognizes the trust as a discretionary one. It propounded to Rubion the following question: "Is it your opinion that you have exercised the discretion awarded you under this will, particularly in this instance, by not sending her some clothing and money or paying the hospital bill?"

Apparently on the theory that the trust instrument is ambiguous, it was developed by Rubion without objection and without contradiction that after Ella Sidney Hansley was confined to the Abilene State Hospital, he, Rubion, talked with the testatrix about Ella's welfare and that the testatrix always wanted to know if Ella was going to be sent back home, and that the testatrix told him, Rubion, "She told me that she always wanted me to look out for whatever there would be left after her death. *That if Ella Hansley was put out or returned to Galveston, that there would be something to take care of her with.*" (Emphasis supplied.) And further, that the testatrix' only request of Rubion was, "that if at any time Ella Hansley was permitted to leave the Abilene State Hospital there and come back to Galveston that I would see then that she was taken care of", and that by the term "taken care of" testatrix meant "that she [Ella Hansley] would have a place to stay and be taken care of like any human."

The trial court found that Rubion discussed the will with the testatrix during her lifetime, and also found:

"That John F. Rubion exercised the discretionary power (as provided in the will of Nellie Hansley) to provide for Ella Hansley, the cestui que trust, by maintaining the income producing real estate in good condition, so that the income therefrom might provide a means of support for her if and when she might be discharged from the Abilene State Hospital."

As the State so contends, we first consider whether independently of statute the State has a common law right to reimbursement of its expense in maintaining patients in the Abilene State Hospital.

In Wiseman v. State, Tex.Civ.App., San Antonio, 94 S.W.2d 265, writ refused, it was held that the State had no right to reimbursement for the care and maintenance of demented persons since such right did not exist at common law so that the State's right to reimbursement, if any, must rest upon statutory enactment. In view of the Supreme Court's unqualified refusal of a writ in Wiseman v. State, that opinion has the force of Supreme Court law.

Though not discussed in the opinion, the holding is necessarily based on the proposition that the maintenance by the State of institutions for the care of demented persons is "charitable in character, for the public welfare, and without any intendment of compensation for the care of those confined therein." 28 Amer.Jur., page 683, "Insane and Other Incompetent Persons," Sec. 43.

While the Abilene State Hospital for epileptics is not an asylum, admission to which is conditioned on insanity, there is no doubt in our minds, in the light of statutory Title 51, "Eleemosynary Institutions," that the Abilene State Hospital is basically an eleemosynary and charitable institution, and, in our opinion, the same considerations

which sustain the ruling in Wiseman v. State establish that at common law the State has no right to reimbursement of its expense of maintaining patients in such hospital. It follows, then, that if the State is entitled to reimbursement, such right must rest upon statutory authority. . . .

The State relies alternatively upon statutory support for its right to reimbursement and cites former Article 3232, R.S.T. 1925, Article 3232a, V.A.T.S., Acts of the 51st Legislature of 1949, Ch. 406, p. 756, and Article 3196a, V.A.T.S., Acts of the 45th Legislature of 1937, Ch. 152, p. 293.

Appellee Rubion contends that there is no presently existing statutory authority for reimbursement to the State of the sums involved. He argues as follows: Article 3196a is inapplicable. Prior to the 1949 enactment from which Article 3232a is taken the State's right to reimbursement rested solely on Article 3232, R.S.T.1925; but, in 1949 the Legislature, by the above cited Act, expressly repealed Article 3232, R.S.T.1925, attempting to substitute therefor Sec. 11 of the same Act. However, though the 1949 Act is effective and valid to repeal old Article 3232, still, under Article 3, Sec. 35 of the Constitution of Texas, Vernon's Ann.St. it is invalid as to Sec. 11 whereby the Legislature sought to substitute for old Article 3232, Sec. 11 of the 1949 Act, now Article 3232a, V.A.T.S., because the presence in the Act of Sec. 11 is not sufficiently noticed or suggested by the title to the 1949 Act.

Article 3, Sec. 35 of the Constitution of Texas reads as follows:

"Subjects and titles of bills

"Sec. 35. No bill, (except general appropriation bills, which may embrace the various subjects and accounts, for and on account of which moneys are appropriated) shall contain more than one subject, which shall be expressed in its title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void *only as to so much thereof, as shall not be so expressed."* (Emphasis supplied.)

Rubion freely admits the validity of the remaining provisions of the 1949 Act and specially relies upon Sec. 13 thereof which purports specifically to repeal old Article 3232.

The title of the 1949 Act is as follows:

"An Act to provide for the better and more efficient care of epileptic patients at the Abilene State Hospital; defining the duties of the Superintendent; prescribing the means for admission; authorizing the transfer of epileptic patients from the mental hospitals to the epileptic hospital; prescribing the duties of the County Judge regarding admissions; providing for a repealing clause; and declaring an emergency."

Sec. 11 of the Act is as follows:

"Sec. 11. Indigent public patients shall be supported entirely at the expense of the State. Non-indigent public patients shall be kept and maintained at the expense of the State as in the first instance; but in such cases the State shall have the right to be reimbursed for the support, maintenance and treatment of such non-indigent patients and the claim of the State for such support, maintenance and treatment shall constitute a valid lien against property of such patient, or in case he has a guardian, against the estate, or against the person or persons who may be legally liable for his support, maintenance and treatment and financially able to contribute thereto; and such claim may be collected by suit or other procedures, in the name of this State, by the county or district attorney of the county from which said patient is sent, or in case of the refusal or inability of both to act, the Attorney General shall represent the State against such patient, his guardian,

or the person or persons liable for his support, maintenance and treatment, as the case may be; such suit or proceeding to be instituted upon the written request of the State Board of Control, accompanied by the certificate of the superintendent of the hospital as to the amount due the State, which shall in no case exceed the sum set by the Board of Control. In all such suits or proceedings, the certificate of the superintendent shall be sufficient evidence of the amount due the State for the support of such patient. The county or district attorney representing the State shall be entitled to a commission of ten per cent (10%) of the amount collected. All money so collected, less such commission, shall be, by said attorney, paid to the hospital, which shall receive and receipt for the same and shall use the same for the maintenance and improvement of said hospital."

Subsection (5) of Sec. 7 of the same Act reads as follows:

"Sec. 7. The parent, guardian or friend of any epileptic not seeking admission as a private patient, may make application in writing and under oath to the County Judge of the county wherein such epileptic resides for the admission into said hospital, which application shall show:

\*　　\*　　\*　　\*　　\*　　\*

"(5) Whether the epileptic has anyone legally liable for his support; if so, whom, what property possessed by such person and the estimated value thereof."

■ We do not agree with appellee's contention that Sec. 11 of the 1949 Act is void. We find nothing in the title to the Act calculated to conceal the presence in it of Sec. 11. On the other hand, since Sec. 11 provides for the appropriation to the use of the Abilene State Hospital of all reimbursement moneys collected, it

seems to us that the provisions of Sec. 11 afford a means of and have direct relation to providing for "the better and more efficient care of epileptic patients at the Abilene State Hospital." It also seems to us that Sec. 11 may fairly be said to relate to the basis and means for admission to the hospital and that subject we consider to be adequately suggested by the presence in the title of the expression "prescribing the means for admission."

However, if we be wrong in overruling appellee's contention that Sec. 11 of the 1949 Act is void by reason of Article 3, Sec. 35 of the Constitution, still in our opinion it does not follow that there is no extant valid provision of the statutes authorizing the State to be reimbursed for care and maintenance of patients at the Abilene State Hospital.

■ We are of the view that independently of the 1949 Act, and at the time of its passage, the State's right to reimbursement was fully supported by the 1937 Act, Article 3196a, V.A.T.S. In fact, we are of the opinion that the 1937 Act itself repealed old Article 3232, R.S.T.1925, and this on the principle stated in 39 Tex.Jur., page 148, title "Statutes", Sec. 80, that "Where it is apparent that a statute is intended to embrace all the law upon the subject with which it deals, it repeals all former laws relating to the same subject."

By Sec. 1 of the 1937 Act, Article 3196a, it is made to apply to all State hospitals and State psychopathic hospitals, and to all patients admitted thereto. It would unduly extend this opinion to analyze Article 3196a in detail, but suffice it to say the Act purports to be a comprehensive one, freshly and fully occupying the field to which old Article 3232, R.S.T.1925, related; and we have no doubt that the Legislature intended the 1937 Act, Article 3196a as a substitute enactment for all former laws relating to the field which it covers.

We consider this view to be reinforced by the repeal section of the 1937 Act, Ar-

ticle 3196a, being Sec. 6, which specifically repeals only Article 3189, R.S.T.1925, but expressly provides for the reservation and preservation to the State of any and all rights and causes of action which accrued or arose under and by virtue of "any other laws repealed by this Act." The Legislature was apparently conscious that its 1937 enactment would repeal Article 3232, R.S.T.1925 and other similar statutes and was therefore solicitous to preserve all rights of the State which had accrued under such repealed statutes. Without a saving clause, the State would have lost its rights theretofore accrued under any repealed law. Wiseman v. State, supra.

We are satisfied that by the enactment of the 1937 Act, Article 3196a, the Legislature intended to repeal, in addition to Article 3189 specifically referred to, all other laws providing for reimbursement to the State of the expense of support, maintenance and treatment of patients admitted to any State hospital, including the Abilene State Hospital for epileptics; and, therefore, that it was the legislative intent by the enactment of the 1937 Act, Article 3196a, V.A.T.S., to repeal Article 3232, R.S.T. 1925.

■ Believing as we do that the State has a clear right to reimbursement under the 1937 Act, Article 3196a, from the persons named therein, we think we should look primarily to Article 3196a for the State's fundamental right to maintain suits of the instant character; and this is so whether or not, as contended by appellee, Sec. 11 of the 1949 Act is void. Because, when the provisions of the 1937 Act, Article 3196a, are read in pari materia with Sec. 11 of the 1949 Act, there is no conflict between them. There is no contention that the 1949 Act, Article 3232a, V.A.T.S., repeals the 1937 Act, Article 3196a in whole or in part.

The applicable provisions of Article 3196a are as follows:

" * * * Non-indigent patients are those who possess some property out of which the State may be reimbursed, or who have someone legally liable for their support. This class shall be kept and maintained at the expense of the State, as in the first instance, but in such cases the State shall have the right to be reimbursed for the support, maintenance, and treatment of such patients.

"Persons chargeable with expenses of patients

"Sec. 2. Where the patient has no sufficient estate of his own, he shall be maintained at the expense:

"Of the husband or wife of such person, if able to do so;

"Of the father or mother of such person, if able to do so."

It is clear from the foregoing that the State may look for reimbursement only to (a) property of the patient, (b) the husband or wife of the patient, if able to pay, and (c) the father or mother of the patient, if able to pay.

Since here there is involved only the question of the existence of property of the patient, Ella Sidney Hansley, it is our opinion that the trial court's judgment denying the State recovery against the trustee must stand or fall on the question of whether the beneficiary, Ella Hansley, has any enforceable claims against the trustee and the trust assets which may be said to constitute her property. The State contends that Ella Hansley does have such enforceable claims; that such claims constitute property of Ella Hansley, and that such property can and ought to be subjected to equitable execution, as it were, in the present proceeding.

■ The existence of any such presently enforceable claims, in our view, must depend upon a showing by the State that Rubion abused the discretion vested in him by this support trust in failing to pay Ella

Hansley's way at the Abilene State Hospital, and this on the theory that such expense was a necessary, which, as a matter of law, under the undisputed facts, Ella Hansley was entitled to have appropriated for her benefit out of the trust assets.

Restatement of The Law, Trusts, Secon 157, reads as follows:

"Although a trust is a spendthrift trust or a trust for support, the interest of the beneficiary can be reached in satisfaction of an enforceable claim against the beneficiary.

\* \* \* \* \* \*

"(b) for necessary services rendered to the beneficiary or necessary supplies furnished to him: \* \* \*."

■ We are in full agreement with the canon announced by the Restatement, if, as we apprehend, the interest of the beneficiary referred to is a present enforceable interest in trust assets. So, as we see it, the determinative issue is whether during the period involved there arose in favor of Ella Sidney Hansley any right whereby she was entitled to have a court of equity direct payment to her or for her on account of necessary support at the Abilene State Hospital. In our opinion, the evidence demands a negative answer to this question.

The provisions of the writing establishing the trust, it seems to us, are ambiguous. There is no outright statement that the trust assets are to be used immediately or at any particular time, or in any particular amount, for the support of the beneficiary. On the other hand, the trustee is directed to use his discretion and judgment in the stewardship, utilization and investment of trust assets to "provide *a means*" for Ella Hansley's support. It is expressly directed that the trustee is to have full and complete powers of ownership in order that to the best of his ability he may carry out the purpose of the trust which is expressly stated to be "to provide *a means* of support for \* \* \* Ella Hansley \* \* \* and to provide for her \* \* \* using therefor either the income or corpus of such estate, or both *as the exigencies of the situation may require."* (Emphasis supplied.)

The language of the trust suggests, to our minds, at least, a strong possibility that the testatrix intended that the trustee should keep the estate intact during the life of Ella Hansley until and unless some compelling circumstance should require that the estate, either income or corpus, be appropriated for Ella Hansley's support and maintenance. "Exigency" is defined in Funk & Wagnalls Practical Standard Dictionary as follows: "The state of being urgent or exigent; pressing need or demand; also, a case requiring immediate attention, assistance, or remedy; a critical period or condition; a pressing necessity; as, who will aid us in this exigency? He was reduced to great exigency."

It can hardly be denied that the terms of the trust are sufficiently ambiguous to permit the introduction of parol evidence to clarify its meaning and to avoid indefiniteness.

This being true, when we look to the above quoted testimony of the trustee that the testatrix wanted her estate preserved so that "if Ella Hansley was put out [of the Abilene State Hospital] or returned to Galveston there would be something to take care of her with," and that the testatrix's only request of Rubion was "that if any time Ella Hansley was permitted to leave Abilene State Hospital there and come back to Galveston that I [Rubion] would see *then* that she was taken care of," there can be little question that the trial court was justified in determining as a fact that it was the intention of the testatrix that the trust estate be maintained "so that the income therefrom might provide *a means of support* for her if and when she might be discharged from the Abilene State Hospital."

An additional supporting circumstance in the evidence is that while Ella Hansley was confined in the Abilene State Hospital, the testatrix, as the mother of the patient, never paid anything on account of the maintenance, support and treatment of Ella Hansley. While the proof is not positive one way or another, the fact that the testatrix was possessed of a small estate would indicate an ability on her part to pay at least something on account of the maintenance and care of Ella Hansley had she had any desire to do so. The proof is undisputed that Ella Hansley was confined to the Abilene State Hospital for a considerable period prior to the death of the testatrix, yet the testatrix paid nothing to the State by way of reimbursement. In view of this and of the ambiguity in the will and of the testimony to which we have referred, we are unable to say the trial court was unauthorized to find as a fact, as is clearly implied from his above quoted fact finding, that it was not the intention of the testatrix that the trust estate be used in whole or in part to reimburse the State, or for that matter to any extent for the support of the beneficiary so long as she remained at the Abilene State Hospital.

While not cited by either party, the Connecticut case of City of Bridgeport v. Reilly, 1946, 133 Conn. 31, 47 A.2d 865, has come to our attention. The facts involved in that case are closer by far to those in the present appeal than any other which we have located and the court's reasoning has been very helpful to us in arriving at our own conclusions. We, therefore, review the case at greater length than we ordinarily would.

The suit was one by the City of Bridgeport to recover sums paid out by it at the rate of $3 a week to the Connecticut State Hospital for the Insane for the support of the incompetent, Francis A. Coughlin, from April 30, 1921, down to the date of the action. Coughlin had a legal "settlement" in Bridgeport and Bridgeport was obligated to reimburse the State for Coughlin's support.

Coughlin was a nephew of the deceased wife of one William Anderson. He was committed at the instance of Anderson, who paid the State its charges for his support until April 30, 1921. From that time forward Anderson made no further payments.

At the time of trial, it appeared doubtful that Coughlin would ever regain his sanity but that possibility was not altogether beyond hope. William Anderson died January 13, 1929. On February 10, 1919, he created a $3,500 testamentary support trust for Coughlin during his life, with discretion in the trustee to expend or appropriate any or all of the income or principal for the comfortable support of Coughlin. Upon Coughlin recovering his health, the trustee was directed to pay over any unexpended part of the trust corpus to Coughlin. Any remaining assets in the trust at the death of Coughlin were to go to certain named remaindermen. The will was executed while Anderson was paying the State for Coughlin's support but on March 29, 1926, approximately five years after Anderson discontinued such payments, he executed a codicil to the will, which named additional remaindermen but left the provisions of the trust unchanged.

In an earlier proceeding by the State against the trustee—Reilly v. State, 119 Conn. 508, 177 A. 528—to which Coughlin was not a party, the court held the trust to be a spendthrift trust and not liable for Coughlin's support under statutory provisions which made the incompetent or his estate liable for reimbursement. The court pointed out that Coughlin was not a party to that action and held that no title to trust assets passed to the beneficiary unless and until appropriated to him by the trustee and then only to the amount determined by the trustee. In the earlier proceeding the State claimed that the trustee's neglect to make appropriations for Coughlin's support was an abuse of dis-

cretion, which justified an order directing that such amount as the court might deem proper be paid to the State; but the court found no occasion to pass on that question because Coughlin had not been made a party. In the second proceeding, after citing authorities establishing that a support trust was subject to the claims of creditors supplying necessaries to the extent the assets of the trust had been appropriated by the trustee to the support of the beneficiary, the court said [133 Conn. 31, 47 A.2d 867]:

> "In this case the will gave the trustee a discretion to withhold all payments for the support of Coughlin. When discretion is given to a trustee, his exercise of it is subject to the control of the court, to the extent, and only to the extent, that there has been an abuse of it. * * *: An abuse of discretion is the basis for action by the court and the *question whether it has occurred depends necessarily upon the consideration of all relevant circumstances.* * * *

> "In determining whether the successive trustees abused their discretion in not using the principal and income of the fund to reimburse the city for the payments it had made on Coughlin's account, it must be remembered that the clear purpose of the testator was that the fund should be used in the discretion of the trustee for Coughlin's comfortable support as there might be occasion to do so from time to time. * * *

> "The principal claim of the city is, however, largely based on the contention that it was the intention of Anderson, expressed in his will, that the fund should be used for Coughlin's support, whether or not he continued to be an inmate of a state institution, until such time as he might recover his health. When Anderson executed the will, he knew that Coughlin was in a state institution and the former

was, in fact, paying for the latter's support there. Anderson undoubtedly knew that the state was furnishing Coughlin such support as was suitable for a man in his circumstances. Had Anderson intended that the principal and income from the fund should be used after his death to continue payments for Coughlin's support in the hospital, it would have been natural for him to have so directed, rather than to give to the trustee a broad discretion to use it for Coughlin's comfortable support. When in 1926 Anderson made the codicil to his will, he ratified and confirmed the provisions of clause two, except as regards the inclusion of the child of William A. Reilly born after the making of the will. At that time he had made no payments for Coughlin's support at the hospital for about five years. It is impossible to escape the conclusion that Anderson, by making the provision he did for Coughlin's support, was thinking of the use of the fund to *supplement the care and support which the state was furnishing Coughlin while he was an inmate of the hospital, or to provide for him elsewhere should he be in need of support after he had left it but before he so far recovered his health that the fund should be turned over to him.* This was in substance the construction placed by the trial court upon the will, and it differentiates this case from those where the intent of the testator in establishing a trust was primarily to afford *general support for the beneficiary.* Walters' Case, supra [278 Pa. 421, 123 A. 408]; Town of Shrewsbury v. Bucklin, supra, 105 Vt. [188], 192, 163 A. 626, 86 A.L.R. 133; Hanford v. Clancy, supra [87 N.H. 458, 183 A. 271]; Pole v. Pietsch, supra [61 Md. 570]. *The situation falls within the principle that a trustee, in determining whether to make expenditures under a discretionary trust for support, is entitled to take into consideration oth-*

*er· means of support available ·to. the beneficiary.* Bridgeport-City Trust Co. v. Beach, 119 Conn. 131, 138, 174 A. 308; Stempel v. Middletown Trust Co. 127 Conn. 206, 220, 15 A.2d 305, 157 A.L.R. 657. We agree with the trial court that there was, and is, no duty upon the successive trustees to use the fund to pay for Coughlin's support while he is an inmate of a state hospital, and that, consequently, the defendant is not obligated to use it to reimburse the city for the sums it has spent for that purpose." ·(Emphasis supplied.)

Affirmed.

HAMBLEN, C. J., not sitting.